90 F.3d 1026
 65 USLW 2128
 G. Scott LOVE, Paul S. Bergeron, Kathleen B. Balhoff, and
Bennie Baker-Bourgeois, Plaintiffs-Appellants,
v.
Michael J. FOSTER, Jr., Governor of State of Louisiana, and
Fox McKeithen, Secretary of State of Louisiana,
Defendants-Appellees.
 No. 96-30429.
 United States Court of Appeals,
Fifth Circuit.
 July 30, 1996.
 
 Thomas E. Balhoff, Judith R. Atkinson, Roedel, Parsons, Hill & Koch, Baton Rouge, LA, Daniel Joseph Balhoff, John S. Baker, Baton Rouge, LA, M. Miller Baker, Carr, Goodson & Lee, Washington, DC, for plaintiffs-appellants.
 Roy A. Mongrue, Jr., Asst. Atty. General, Angie Rogers LaPlace, Office of the Attorney General for the State of Louisiana, Baton Rouge, LA, for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Louisiana.
 Before DAVIS and DENNIS, Circuit Judges, and FALLON*, District Judge.
 W. EUGENE DAVIS, Circuit Judge:
 
 
 1
 Appellants, four Louisiana voters, appeal from the district court's order granting defendants' motion for summary judgment and dismissing plaintiffs' suit seeking declaratory and injunctive relief on grounds that Louisiana's method of conducting congressional elections violates the Constitution and laws of the United States. We reverse.
 
 I.
 
 2
 In August 1995 four Louisiana citizens, who are registered to vote in Louisiana and who have a history of voting in congressional elections, filed this action for declaratory and injunctive relief. They seek this relief under 42 U.S.C. § 1983 and pursuant to our federal question jurisdiction to resolve a Constitutional claim. Their core allegation is that the Louisiana open primary system violates the federal statutes that establish a uniform federal election day for members of Congress and must yield under the Supremacy Clause of the Constitution. After cross-motions for summary judgment were filed, the district court granted summary judgment for the defendants. The appellants filed a timely appeal.
 
 II.
 
 3
 We review a district court's grant of summary judgment de novo. Mozeke v. International Paper Co., 856 F.2d 722, 724 (5th Cir.1988). In deciding this appeal, we address only the pre-emption claim. See Shaw v. Delta Air Lines, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983).
 
 
 4
 In Louisiana Public Service Comm. v. FCC, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986), the Supreme Court summarized the theories under which state laws are pre-empted as follows:
 
 
 5
 Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation.
 
 
 6
 Id. at 368-69, 106 S.Ct. at 1898-99 (internal citations omitted).
 
 
 7
 We start our pre-emption analysis from the bedrock premise that Congress has authority to enact the requirements for federal elections. Article I, Section 4, Clause 1 of the Constitution states:
 
 
 8
 The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as the Places of choosing Senators.
 
 
 9
 In Smiley v. Holm, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932), the Court, interpreting Art. I, § 4, Cl. 1, stated that "[i]t cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration,...." Id. at 366, 52 S.Ct. at 399.
 
 
 10
 In 1872, Congress established a uniform election day for elections for U.S. Representatives by enacting 2 U.S.C. § 7, which states:
 
 
 11
 The Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter.
 
 
 12
 This same election day was later adopted for elections for U.S. Senators in 2 U.S.C. § 1:
 
 
 13
 At the regular election held in any State next preceding the expiration of the term for which any Senator was elected to represent such State in Congress, at which election a Representative to Congress is regularly by law to be chosen, a United States Senator from said state shall be elected by the people thereof for the term commencing on the 3d day of January next thereafter.
 
 
 14
 Congress also set this day for the election of presidential electors. 3 U.S.C. § 1.[1]
 
 
 15
 Congress in 2 U.S.C. §§ 1, 7 therefore declared that all elections for Congress should be held on the same date, the Tuesday following the first Monday in November (federal election day). This declaration was subject to only two exceptions: (1) in states that required a majority vote for election, a runoff could be held between federal election day and January when officials take office; and (2) an election could be held on a different date if a vacancy occurred in the office. 2 U.S.C. § 8.[2] In adopting this scheme, Congress precluded a state from holding an election in which members of Congress could be elected before the federal election date.
 
 
 16
 This interpretation is supported by the legislative history. This history indicates that Congress wanted a uniform election day to prevent earlier elections in some states unduly influencing the later voters, to prevent fraudulent voting in multiple state elections, and to remove the burden of voting in more than one federal election in a given year. Cong.Globe, 42d Cong., 2d Sess. 112 (1871).[3]
 
 
 17
 The legislative history of 2 U.S.C. § 8 also supports the conclusion that Congress intended any outcome determinative election to be held on federal election day unless it fell within the exception in § 8 During the consideration of § 8, Senator Thurman explained that Section 8
 
 
 18
 relates only to the case of a special election to fill a vacancy, or where there is a failure to elect. It does not touch the general elections for members of the House of Representatives. The cases, therefore, to which it will apply are very rare indeed. It is very seldom that there is an election to fill a vacancy, and still more seldom that there is a failure to elect. In all those States in which a plurality elects, no such thing as failure to elect can occur unless there should be a tie, and in those cases I think in every State the right then is determined by lot....
 
 
 19
 I think, therefore, there can be no failure to elect except in those States in which a majority of all the votes is necessary to elect a member, and they are very few in number. Then there is no probability of there being a failure to elect so as to make this section necessary in many cases, and the vacancies that happen are very few indeed. The section itself, therefore, is rather inserted out of abundant caution than for any other reason.
 
 
 20
 Cong.Globe, 42d Cong., 2d Sess. 677 (1872) (remarks of Sen. Thurman) (emphasis added).
 
 
 21
 For all of the above reasons, we conclude that Congress intended that all determinative federal elections be held on federal election day except for the rare exceptions specified in 2 U.S.C. § 8.
 
 
 22
 We turn next to the Louisiana election scheme which appellants contend conflicts with 2 U.S.C. §§ 1, 7. Before 1978, Louisiana's election system for selection of representatives and senators complied with the federal election day statutes. The pre-1978 Louisiana law required recognized political parties to nominate candidates through partisan primaries. The parties' nominees for Congress would then appear on the ballot on federal election day. Independent candidates and others who wished to appear on the federal election day ballot with the party nominees were required to qualify by other methods. The names of all qualified candidates were placed on the federal election day ballot. The candidate who received the most votes in this election was declared the winner. See La.Rev.Stat. § 18:546 (now repealed).
 
 
 23
 In 1978, Louisiana drastically changed its method for selecting federal and state officials by adopting an open primary system. Under this system, all candidates, regardless of party affiliation, appear on the same ballot and all voters regardless of party affiliation may vote for the candidate of their choice. La.Rev.Stat. § 18:401(B).[4]
 
 
 24
 This open primary is ordinarily[5] held "on the first Saturday in October next preceding the date of the general election." La.Rev.Stat. § 18:1272(A).[6] See also La.Rev.Stat. § 18:1272(B). To win in the October primary, a candidate must receive a majority of the votes cast. Louisiana holds its general election on the federal election day. Id. But the names of congressional candidates (like candidates for statewide office) only appear on the general election ballot if no single candidate receives a majority of the votes in the primary and a runoff between the two top candidates is required. La.Rev.Stat. § 18:1271.[7]
 
 
 25
 Thus the Louisiana open primary system allows contested elections for Congress to be decided in the primary, which is held at least one month before the general election. This is the portion of the Louisiana election scheme that appellants contend is in conflict with 2 U.S.C. §§ 1, 7. The Louisiana election code provides that: "A candidate who receives a majority of the votes cast for an office in a primary election is elected." La.Rev.Stat. § 18:511(A). When the seat in Congress is filled in the October primary, no candidate's name appears on the ballot in the November general election and no vote for that office can be cast on the federal election date. In fact, since 1978 over 80% of the contested congressional elections have been decided in the October primary. Only nine of fifty-seven contested elections for U.S. Representatives and one of six contested elections for U.S. Senator had candidates placed on the general election ballot for November.
 
 
 26
 Appellants argue that the 2 U.S.C. §§ 1, 7 sets the earliest day that a state may hold a contested election for Congress where the winner may be determined. Appellants contend that the Louisiana election system conflicts with this provision by allowing such an election at an earlier date.
 
 
 27
 Appellees assert that the purpose of the primary election is to qualify candidates to appear on the November ballot. They argue that when one candidate receives a majority of the votes in the primary, only one candidate qualifies and the state is not required to place the single qualified candidate on the November ballot. We disagree. The state's argument that the actual election occurs on the federal election day is refuted by the language of the Louisiana Election Code which states that "[a] candidate who receives a majority of the votes cast for an office in a primary election is elected." La.R.S. § 18:511(A) (emphasis added).
 
 
 28
 We agree with appellants that the Louisiana election system, as applied to elections for congressmen, conflicts with the federal statutes that establish a uniform federal election day and thwarts the congressional purpose of establishing a uniform day to prevent earlier elections from influencing later voters. Thus, the Louisiana system as applied to federal elections must yield under the Supremacy Clause.
 
 III.
 
 29
 Having decided that the Louisiana open primary election scheme conflicts with 2 U.S.C. §§ 1, 7, we now turn to a consideration of the appropriate remedy.
 
 
 30
 Appellants contend that this court should declare the 1978 Louisiana election code invalid and reinstate the pre-1978 election law. See Frost v. Corporation Common, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483 (1929). This drastic remedy would require us to radically overhaul the state's election procedure and reinstate an election system which the state abolished eighteen years ago.
 
 
 31
 In exercising our discretion in granting or withholding an injunction we balance "the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction." Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 675, 88 L.Ed. 834 (1944).
 
 
 32
 Courts should be particularly loathe to preempt a state legislative task such as establishing an election scheme. Even in reapportionment cases where the voters' Fourteenth Amendment rights to equal protection is infringed, federal courts frequently give the state an opportunity to remedy the defect before fashioning a judicial remedy. Westwego Citizens for Better Government v. City of Westwego, 946 F.2d 1109 (5th Cir.1991); Mississippi State Chapter, Operation Push, Inc., v. Mabus, 932 F.2d 400 (5th Cir.1991).
 
 
 33
 In addition to this federalism concern, a number of additional factors weigh against the issuance of an injunction: (1) The campaign for statewide and federal offices for the September 21 open primary election is well underway. Qualification date for candidates for those offices closed on Friday, July 12, 1996. Enjoining that election would be expensive for the candidates and the State. Ordering another election at a different time would also be confusing to the voters. (2) By contrast, the injury to the plaintiffs will be relatively minimal. To be assured of participating in the election of their representatives and senators, plaintiffs must vote on September 21. But they have the right to vote in those elections on that date and if they do so, their vote will count. If plaintiffs' representatives and senators are elected on September 21, they will be required to return to the polls on November 5 to vote in the presidential election. However, compared with the cost of enjoining the September 21 election, two trips to the polls is a relatively minor cost.
 
 CONCLUSION
 
 34
 For the reasons discussed above, we conclude that plaintiffs are entitled to a declaratory judgment that Louisiana's election scheme conflicts with 2 U.S.C. §§ 1, 7 to the extent that the Louisiana scheme authorizes a contested election for members of Congress to be decided in the open primary before the uniform federal election day. The next scheduled session of the Louisiana legislature is in May 1997. We remand this case to the district court with directions to reconsider plaintiffs' request for injunctive relief if the state has not acted to resolve the conflict within a reasonable time after the 1997 legislative session. We also remand all remaining issues in this case to the district court.[8]
 
 
 35
 REVERSED and RENDERED.
 
 DENNIS, Circuit Judge, dissenting:
 
 36
 Article I, Section 4, Clause 1 of the United States Constitution establishes the power and the duty of each state legislature to prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," subject to the power of the Congress to "at any time by Law make or alter such Regulations, except as to the Places of choosing Senators." Thus, except to the extent that Congress acts to change or supplement state laws, the States retain broad authority to regulate elections under the Times, Places and Manner Clause. It cannot be doubted that the Clause invests each state legislature with the "authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns[ ]." Smiley v. Holm, 285 U.S. 355, 366, 52 S.Ct. 397, 399, 76 L.Ed. 795 (1932).
 
 
 37
 This view is confirmed by the second clause of article 1, § 4, which provides that "the Congress may at any time by law make or alter such regulations," with the single exception stated. The phrase "such regulations" plainly refers to regulations of the same general character that the legislature of the State is authorized to prescribe with respect to congressional elections. In exercising this power, the Congress may supplement these state regulations or may substitute its own. It may impose additional penalties for the violation of the state laws or provide independent sanctions. It "has a general supervisory power over the whole subject." [Citations omitted.] But this broad authority is conferred by the constitutional provision now under consideration, and is exercised by the Congress in making "such regulations"; that is, regulations of the sort which, if there be no overruling action by the Congress, may be provided by the Legislature of the state upon the same subject.
 
 
 38
 Id. at 366-367, 52 S.Ct. at 399. See also, Roudebush v. Hartke, 405 U.S. 15, 24-25, 92 S.Ct. 804, 810-11, 31 L.Ed.2d 1 (1972); ("Unless Congress Acts, Art. I, § 4, empowers the States to regulate the conduct of senatorial elections."); Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974) ("[ ] Art I, § 4, cl 1, authorizes the States to prescribe '[t]he Times, Places and Manner of holding Elections for Senators and Representatives.' "); United States v. Classic, 313 U.S. 299, 311, 61 S.Ct. 1031, 1035-36, 85 L.Ed. 1368 (1941) ("[T]he states are given, and in fact exercise, a wide discretion in the formulation of a system for the choice by the people of representatives in Congress.")
 
 
 39
 Congress, in deference and respect to the states, has been slow to exercise the powers expressly conferred upon it in relation to elections by the fourth section of the first article of the Constitution. See, "The Ku-Klux Cases." Ex Parte Yarbrough et al., 110 U.S. 651, 660-662, 4 S.Ct. 152, 156-58, 28 L.Ed. 274 (1884). It was not until 1842 that Congress took any action under the Times, Places and Manner Clause by providing that each member of Congress should be elected by a separate district, composed of contiguous territory. 5 St. 491. Id. Thirty years afterwards, in an act to apportion representatives to Congress among the several states according to the ninth census, Congress provided for the first time a regulation for the time of holding elections of representatives. The Act of Feb. 2, 1872, ch. 11. §§ 3 and 4, 17 Stat 28, 29, in pertinent parts, provides:
 
 
 40
 Sec. 3. That the Tuesday next after the first Monday in November, in the year eighteen hundred and seventy-six, is hereby fixed and established as the day, in each of the States and Territories of the United States, for the election of Representatives and Delegates to the forty-fifth Congress; and the Tuesday next after the first Monday in November, in every second year thereafter, is hereby fixed and established as the day for the election, in each of said States and territories, of Representatives and delegates to the Congress commencing on the fourth day of March next thereafter.
 
 
 41
 Sec. 4. That if, upon trial, there shall be a failure to elect a Representative or Delegate in Congress in any State, District, or Territory, upon the day here by fixed and established for such election, or if, after any such election, a vacancy shall occur in any such State, District, or Territory, from death, resignation, or otherwise, an election shall be held to fill any vacancy caused by such failure, resignation, death, or otherwise, at such time as is or may be provided by law for filling vacancies in the State or Territory in which the same may occur.
 
 
 42
 In substance, the same provisions have been continued in the present federal statutes regulating the time of holding elections for Representatives. 2 U.S.C. § 7 provides that the Tuesday next after the first Monday in November, in every even numbered year, is established as the day for the election in each of the states and territories. 2 U.S.C. § 8 provides that the time for holding elections for Representative to fill a vacancy, whether such vacancy is caused by a failure to elect at the time prescribed by law, or by the death, resignation, or incapacity of a person elected, may be prescribed by the laws of the several states and territories respectively.
 
 
 43
 The Louisiana laws prescribing the times, places and manner of holding elections for Senators and Representatives provide for "open" primary and general elections. All qualified voters may vote for candidates in primary and general elections without regard to the voter's party affiliation or lack of it, and all candidates who qualify for a primary or general election may be voted on without regard to the candidate's party affiliation or lack of it. La.R.S. 18:401(B). The times for the elections are fixed as follows: (a) The primary election is held on the first Saturday in October next preceding the date of the general election, La.R.S. 18:1272(A); and (b) the general election is held on the Tuesday next after the first Monday in November in every even numbered year, i.e., on the federal election day. La.R.S. 18:1272(B). The Louisiana laws also provide that a candidate who receives a majority of the votes cast in the primary election "is elected." La.R.S. 18:511(A).
 
 
 44
 The plaintiffs contend that the Louisiana election laws are unconstitutional because they (a) allow a possibility that a candidate for Representative will be elected by receiving a majority of votes in the primary election; (b) and are thus contrary to the federal statute which requires that a Representative be elected on the federal election day, which Louisiana designates as the general election day.
 
 
 45
 The Supremacy Clause, Art. V, cl. 2 of the United States Constitution, provides that:
 
 
 46
 This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the contrary notwithstanding.
 
 
 47
 The United States Supreme Court has developed a doctrine of preemption for deciding when a state law or constitution, in whole or in part, is "contrary" to the United States Constitution, or a valid federal law or treaty, made in pursuance thereof, that requires the state provision to yield to the federal. The principal precepts comprising this doctrine were summarized recently by the court in Northwest Central Pipeline Corporation v. State Corporation, Commission of Kansas, 489 U.S. 493, 509, 109 S.Ct. 1262, 1273, 103 L.Ed.2d 509 (1989):Congress has the power under the Supremacy Clause of Article VI of the Constitution to pre-empt state law. Determining whether it has exercised this power requires that we examine congressional intent. In the absence of explicit statutory language signaling an intent to pre-empt, we infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law, Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), or where the state law at issue conflicts with federal law, either because it is impossible to comply with both, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143, 83 S.Ct. 1210, 1217-1218, 10 L.Ed.2d 248 (1963), or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives, Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). See Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 299-300, 108 S.Ct. 1145, 1150-1151, 99 L.Ed.2d 316 (1988); Louisiana Public Service Comm'n v. FCC, 476 U.S. 355, 368-369, 106 S.Ct. 1890, 1898-1899, 90 L.Ed.2d 369 (1986); Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Comm'n, 461 U.S. 190, 203-204, 103 S.Ct. 1713, 1721-1722, 75 L.Ed.2d 752 (1983).
 
 
 48
 Applying the preemption precepts to the Louisiana laws prescribing the times, places and manner of electing Representatives, it is clear that, under the supremacy clause, the state's laws are not contrary to the federal statutes that partially regulate the same subjects. Obviously there is no explicit statutory language signaling an intent to pre-empt, and we cannot infer an intention to occupy the entire field of election regulation because Congress has not legislated comprehensively on the subject. The plaintiffs present no argument to this effect but contend that the state law at issue conflicts with the federal law, either because it is impossible to comply with both or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives.
 
 
 49
 In order to demonstrate that it is impossible to harmonize or to comply with both the state and federal laws the plaintiffs advance an esoteric interpretation of the federal statutes that is not supported by either the scant legislative history or the previous judicial understanding of the those laws and the Constitution. They argue that it was the congressional intent in enacting the predecessor to 2 U.S.C. §§ 7 and 8 to require each state to adopt regulations for electing Representatives that would always result in a contested election for each seat on the federal election day, or at least guarantee that there would be an opportunity for a candidate to qualify for one. Therefore, they contend that the state's open primary and general election laws are totally incompatible with the federal law because they have failed more often than not to produce contested elections for Representatives on the federal election day.
 
 
 50
 The meager legislative history tends to show a congressional aim to establish the federal election day as a center of gravity to prevent the calendrical dispersion of independent state congressional elections. But it does not indicate an intention to prevent variation among the states in the manner of election so long as each election scheme relates to the federal election day by using it either as the primary or general congressional election day. The few remarks by Senators Butler and Thurman express concern over each state's autonomous power to carry out completely independent elections of Representatives and Presidential electors in any month of the year. They feared that under such an undisciplined regime there would be undue influence upon outcomes by strategic timing of elections and the lack of any semblance of uniformity. See majority opinion p. 1029, n. 3, and p. 1030. However, their remarks evince no concern over the fact that primaries closely linked to the proposed federal election day might fail to materialize into contested elections on the Tuesday next after the first Monday in November. From the sparse legislative history one can only infer a legislative objective of rough uniformity by tethering each state's congressional election scheme to the federal election day; the congressional record does not reflect an overweening desire for contested Representative elections in each district on every federal election day.
 
 
 51
 Like its successor, the Louisiana party primary system that preceded the current open primary and general election system, more often than not failed to produce contested elections on the federal election day.[1] The plaintiffs have not supplied any statistics by which we may compare the open primary to the party primary and other systems. However, during the last decade of the old regime, out of a total of 44 Senatorial and Representative elections only 20 resulted in contested elections on the general election day. See, Louisiana Almanac 1995-1996, p. 458-459. During its entire existence the party primary system probably resulted proportionately in even fewer actual contests on the federal election day. In United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941) the Supreme Court observed:
 
 
 52
 Pursuant to the authority given by § 2 of Article I of the Constitution, and subject to the legislative power of Congress under § 4 of Article I, and other pertinent provisions of the Constitution, the states are given, and in fact exercise a wide discretion in the formulation of a system for the choice by the people of representatives in Congress. In common with many other states Louisiana has exercised that discretion by setting up machinery for the effective choice of party candidates for representative in Congress by primary elections and by its laws it eliminates or seriously restricts the candidacy at the general election of all those who are defeated in the primary.
 
 
 53
 * * * * * *
 
 
 54
 [T]he practical operation of the primary law in otherwise excluding from the ballot on the general election the names of candidates rejected at the primary is such as to impose serious restrictions upon the choice of candidates by the voters save by voting at the primary election. In fact, as alleged in the indictment, the practical operation of the primary in Louisiana, is and has been since the primary election was established in 1900 to secure the election of the Democratic primary nominee for the Second Congressional District of Louisiana.2
 
 
 55
 * * * * * *
 
 
 56
 Here, even apart from the circumstance that the Louisiana primary is made by law an integral part of the procedure of choice, the right to choose a representative is in fact controlled by the primary because, as is alleged in the indictment, the choice of candidates at the Democratic primary determines the choice of the elected representative.
 
 
 57
 Id. at 311, 313-314, 318-319, 61 S.Ct. at 1035-36, 1036-37, 1039.
 
 
 58
 Nevertheless, the plaintiffs concede that "[p]rior to the enactment of the open primary regime in 1978, Louisiana's Congressional election system complied with the Federal Election Day Statutes." Appellants' Brief at p. 32. Accordingly, they argue that this court should strike down the open primary law as it applies to Congressional elections and "revive Louisiana's pre-1978 election system for Congressional elections to the extent practicable because the pre-1978 election system is 'the only valid expression of the legislative intent.' Frost, 278 U.S. at 526-27, 49 S.Ct. at 239." Id. This concession and Congress's refusal during the past century to abolish or alter state party primary regulations casts grave doubt on Appellants' argument that it was Congress's intent by the Federal Election Day laws to insure that contested Congressional elections, or the opportunity to qualify for them, take place in every district on each federal election day. Because it is upon this erroneous interpretation of the Federal Election Day laws that appellants rely to show that the state's open election laws are contrary thereto and that it is impossible to comply with both, their argument in this respect is without merit.
 
 
 59
 Appellants and the majority find significance also in the fact that La.R.S. 18:511(A) provides that "[a] candidate who receives a majority of the votes cast for an office in a primary election is elected." Because the Federal Election Day laws do not necessarily preclude a candidate from being declared elected after receiving a majority of the votes in the open primary, I do not believe this provision is contrary to the federal law. However, if the majority concludes that this provision alone prevents the open elections laws from passing Supremacy Clause muster, it would be a simple matter for this court to enjoin such a declaration that a congressional candidate is elected until the federal election day, rather than declaring the whole law unconstitutional in its application to Congressional elections.
 
 
 60
 Nor is the state's open elections law contrary to the Federal Election Day laws because the state law stands as an obstacle to the accomplishment and execution of congressional objectives. 2 U.S.C. § 7 was enacted, the Supreme Court has observed, "to remedy more than one evil arising from the election of members of Congress occurring at different times in the different States." Ex parte Yarbrough, 110 U.S. 651, 661, 4 S.Ct. 152, 157, 28 L.Ed. 274 (1884). But those evils unduly benefiting certain states and political parties and unnecessarily burdening voters and politicians, Cong.Globe, 42nd Cong., 2d Sess. 141 (1871) (remarks of Senator Butler), are not perpetuated by the current state open elections laws any more, if at all, than by the previous party primary laws that appellants wish us to revive. As noted above, the legislative history indicates that the evil perceived by Congress at that time was the unbridled power of the states to independently arrange their election dates in a haphazard and pernicious manner completely untethered to a federally prescribed national election day. Although the present law does impose the burden of double elections on employed voters, so did the old party primary law and so does virtually every other election system. The passage of time, however, "has mitigated those burdens to the extent that "the poor laboring man" no longer "loses his day's work" by going to the polls." Id. See Busbee v. Smith, 549 F.Supp. 494, 524 (D.D.C.1982). Improvements of registration and election laws have greatly reduced the danger of a voter crossing state lines to vote in more than one Congressional district election. The advent of polling coupled with the instantaneity of modern media coverage has largely superceded whatever effects the outcome of a congressional primary in one state may have on an election in another.
 
 
 
 *
 District Judge of the Eastern District of Louisiana, sitting by designation
 
 
 [1]
 3 U.S.C. § 1 states:
 The electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President.
 
 
 [2]
 2 U.S.C. § 8 states:
 The time for holding elections in any State, District, or Territory for a Representative or Delegate to fill a vacancy, whether such vacancy is caused by a failure to elect at the time prescribed by law, or by the death, resignation, or incapacity of a person elected, may be prescribed by the laws of the several States and Territories respectively.
 See, e.g., Public Citizen v. Miller, 813 F.Supp. 821 (N.D.Ga.), aff'd, 992 F.2d 1548 (11th Cir.1993); and Busbee v. Smith, 549 F.Supp. 494 (D.D.C.1982), aff'd, 459 U.S. 1166, 103 S.Ct. 809, 74 L.Ed.2d 1010 (1983).
 
 
 [3]
 Mr. Butler who introduced the amendment stated the following reasons:
 But on account of the facility for colonization and repeating among the large central States, New York holding its election in November, and Ohio, Pennsylvania, and Indiana holding their elections in October, the privilege is allowed the border States, if any man is so disposed, of throwing voters across from one into the other. I think it will be fair for everybody that on the day when one votes all should vote, and that the whole question should be decided then.
 Again, there is another and a different question. Every fourth year many of the States have to hold two elections: one for the State on one day, and one for the electors of President and Vice President on another day. This throws a great burden needlessly and uselessly, it seems to me, upon the people, and I move this for the purpose of having a uniform election to take place in the future at a time when all the State constitutions as to State elections may be conformed to it.
 Cong.Globe, 42d Cong., 2d Sess. 112 (1871).
 On a different day, Mr. Butler reintroduced this amendment and stated:
 Unless we do fix some time at which, as a rule, Representatives shall be elected, it will be in the power of each State to fix upon a different day, and we may have a canvass going on all over the Union at different times. It gives some States undue advantage. It gives some parties undue advantage.... But what I contend is that is an undue advantage, that it is a wrong, and it is a wrong also to the people of those States, that once in four years they shall be put to the trouble of having a double election. On every election day the poor laboring man who goes to the polls to vote loses his day's work, to say nothing of the expenses which fall on the politicians, and are of no very great consequence one way or the other.
 Cong.Globe, 42d Cong., 2d Sess. 141 (1871).
 
 
 [4]
 La.R.S. § 18:401(B) states:
 B. Nature. All qualified voters of this state may vote on candidates for public office in primary and general elections without regard to the voter's party affiliation or lack of it, and all candidates for public office who qualify for a primary or general election may be voted on without regard to the candidate's party affiliation or lack of it.
 
 
 [5]
 The primary is scheduled for September 21 this year because October 5 is a religious holiday
 
 
 [6]
 La.R.S. § 18:1272(A) states:
 A. All general elections for representatives in Congress, sometimes referred to in this Title as congressional elections, shall be held on the first Tuesday next following the first Monday in November, 1982, and every two years thereafter. The primary election shall be held on the first Saturday in October next preceding the date of the general election.
 
 
 [7]
 La.R.S. § 18:1271 states:
 Except as otherwise provided in this Part, United States senators and representatives in Congress shall be elected as provided in this Title for the election of public officers.
 
 
 [8]
 We decide this case under our federal question jurisdiction to resolve a claim under the Supremacy Clause. See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983). The issues not considered in this opinion include whether plaintiffs have stated a claim for a violation of the Privileges and Immunities Clause of the Fourteenth Amendment and whether plaintiffs have stated a claim enforceable under 42 U.S.C. § 1983
 
 
 [1]
 For much of the history of the electoral party primary, Louisiana, like the rest of the South, was a one-party state in which general elections meant little. Paul Grosser, "Political Parties." LOUISIANA POLITICS; FESTIVAL IN A LABYRINTH 257 (1982). See also, United States v. Classic, 313 U.S. 299, 314 n. 2, 61 S.Ct. 1031, 1037 n. 2, 85 L.Ed. 1368 (1941). "Since the end of Reconstruction, the Republican party in Louisiana had served as little more than a nominal element in state politics. The domination of the Democratic party was so pervasive that victory in a Democratic primary invariably meant election." Bennett Wall, LOUISIANA: A HISTORY 2nd Ed. 362 (1990). The Republicans only fielded candidates on an "episodic" basis, and did not elect a member of Congress (after Reconstruction) until 1972. Grosser, supra at 257-8. During all of those decades in which many states held general elections which were often uncontested and usually mere formalities, Congress never chose to act to require the de facto determinative election to be held on federal election day
 
 
 [2]
 For a discussion of the practical effect of the primary in controlling or restricting election of candidates at general elections, see, Hasbrouck, Party Government in the House of Representatives (1927) 172, 176, 177; Merriam and Overacker, Primary Elections (1928) 267-269; Stoney, Suffrage in the South; 29 Survey Graphic, 163, 164