100 F.3d 413
 G. Scott LOVE, Paul S. Bergeron, Kathleen B. Balhoff, and Bennie Baker-Bourgeois, Plaintiffs-Appellants,
v.
Michael J. FOSTER, Jr. Governor of State of Louisiana, and Fox McKeithen, Secretary of State of Louisiana, Defendants-Appellees.
 No. 96-30429
 United States Court of Appeals,
Fifth Circuit
 November 15, 1996.
 
 M Miller Baker, Carr, Goodson & Lee, Washington, DC, Daniel Joseph Balhoff, Baton Rouge, LA, John S Baker, Baton Rouge, LA. Judith R Atkinson, Thomas E Balhoff, Roedel, Parsons, Hill & Koch, Baton Rouge, LA, for plaintiffs-appellants.
 Roy A Mongrue, Jr, Asst Atty General, Angie Rogers LaPlace, Office of the Attorney General for the State of Louisiana, Baton Rouge, LA, for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Louisiana.
 RULING ON PETITION FOR JUDGES REHEARING AND PETITION FOR REHEARING EN BANC
 Before DAVIS, DENNIS and FALLON,[1] District Judge.
 Per Curiam:
 
 
 1
 Treating the Suggestion for Rehearing En Banc as a Petition for Panel Rehearing, the Petition for Panel Rehearing is DENIED. Judge Dennis would grant rehearing for reasons stated in his Dissent. The court having been polled at the request of one of the members of the court and a majority of the Judges who are in regular active service not having voted in favor, the Petition for Rehearing En Banc is DENIED.
 
 
 2
 In response to the petition for rehearing, we make it clear that all we hold is that Louisiana's election plan, to the extent it precludes any legal election for United States Representatives and Senators on Federal Election Day, conflicts with 2 U.S.C. 1 and 7 and is invalid. Also, we do not suggest that Louisiana may not retain its open primary system. One way it can retain this system and avoid any conflict with the federal statute is to hold the open primary on Federal Election Day and provide for a runoff election between November and January when the elected member of Congress takes office. See 2 U.S.C. 8.
 
 
 3
 DENNIS, Circuit Judge, with whom POLITZ, Chief Judge and SMITH, Circuit Judge join, Dissenting from failure to grant rehearing en banc.
 
 
 4
 I respectfully Dissent from the court's failure to grant rehearing en banc because (1) the panel majority erroneously declared a state statute preempted by a federal law due to its failure to correctly apply the controlling Supreme Court precedents regarding federal preemption; and, (2), even as supplemented by per curiam, the panel opinion should be clarified and limited because it casts doubt on the constitutionality of all other state primary election systems.
 
 
 5
 1. The state statute should be upheld under a correct preemption analysis. The consideration of whether a state law is contrary to the Constitution or a federal law and must, therefore, yield under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law. Maryland v. Louisiana, 451 U.S. 725, 746, 68 L. Ed. 2d 576, 101 S. Ct. 2114 (1981); see Cipollone v. Liggett Group, Inc., 505 U.S. 504, 523, 120 L. Ed. 2d 407, 112 S. Ct. 2608 (1992) (citation omitted) ("'The historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.'"). Accordingly, the party claiming preemption has the burden of proof, see 2 Rotunda & Nowak, Treatise on Constitutional Law 12.4 at 90 (2d ed. 1992), and must persuade the court that preemption is proper in one of several ways.
 
 
 6
 "First, Congress can define explicitly the extent to which its enactments pre-empt state law. Pre-emption fundamentally is a intent known through explicit statutory language, the courts' task is an easy one." English v. General Electric Co., 496 U.S. 72, 78-79, 110 L. Ed. 2d 65, 110 S. Ct. 2270 (1990) (citations omitted).
 
 
 7
 "Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a 'scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress 'touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject' . . . . [However], 'where . . . the field which Congress is said to have preempted' includes areas that have 'been traditionally occupied by the States,' congressional intent to supersede state laws must be clear and manifest."'" Id. at 79, 110 S.Ct. at 2275
 
 
 8
 "Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption [1] where it is impossible for a private party to comply with both state and federal requirements, or [2] where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Id.
 
 
 9
 The plaintiffs, G. Scott Love and others, failed to overcome the presumption that "Congress did not intend to displace state law[,]" Maryland v. Louisiana, 451 U.S. 725, 746, 68 L. Ed. 2d 576, 101 S. Ct. 2114 (1981). Nor did they carry their burden of proof to show that preemption is proper in one of the prescribed ways.
 
 
 10
 The plaintiffs correctly, although tacitly, conceded that Congress did not insert specific preemptive language into the federal election day law that explicitly preempted Louisiana's power to regulate Congressional elections. Nor did they base their argument on a field preemption rationale. Moreover, it is evident there was no "clear and manifest" intent on the part of Congress to displace the states' historic function of conducting and regulating Congressional elections. As the Supreme Court in Storer v. Brown, 415 U.S. 724, 729-730, 94 S. Ct. 1274, 1279, 39 L. Ed. 2d 714, (1974) recognized:
 
 
 11
 Under our Constitution . . . the States are given the initial task of determining the qualifications of voters who will elect members of Congress. Art I, 2, cl 1. Also Art I, 4, cl 1, authorizes the States to prescribe "the Times, Places and Manner of holding Elections for Senators and Representatives." Moreover, as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes. In any event, the States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates.
 
 
 12
 Furthermore, the plaintiffs did not contend, and the panel majority did not decide, that the state election law actually conflicts with the federal election day law for the first reason that a state law can be conflict-preempted; i.e., that it is impossible for a private party to comply with both state and federal requirements. The federal election day law applies to the states, not individuals, and therefore places no requirements upon private parties that might conflict with regulation of their conduct by the state.[1]
 
 
 13
 The issue of preemption under the Supremacy Clause is narrowed then to this: Does the state statute "actually conflict" with federal law because the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"?
 
 
 14
 It is not disputed that the main purpose of the federal law, as clearly demonstrated by its text and legislative history, is to establish the federal election day to restrict the states' original powers to conduct Congressional elections in different, dispersed months of the year. Congress feared that, without a federally prescribed benchmark, there could be undue influence upon election results by states' strategic timing of elections and unscrupulous individuals "throwing voters" from one state to another; and that voters would be burdened with double elections in Presidential election years.
 
 
 15
 The plaintiffs concede that the traditional partisan state primary systems, such as Louisiana's pre-1978 system, do not actually conflict with or stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.[2] They admit this even though they also acknowledge that state partisan primary systems frequently determine the outcome of congressional elections prior to the federal election day.[3] The crucial distinction between the partisan primary system and Louisiana's current open primary system for preemption purposes, they contend, however, is that while partisan primary elections may be determinative de facto, they are not conclusive de jure, because it is usually theoretically possible under such state laws for a non-primary candidate to get on the general election ballot on federal election day through nomination papers or write-in procedures. See Appellants' Brief at 10 and Reply Brief at 6.
 
 
 16
 The plaintiffs fail to demonstrate, however, that the Louisiana open primary law hinders the accomplishment of the purpose of the federal election day law. Certainly, they have not shown that it does so any more than Louisiana's former party primary law or other typical partisan primary systems. Neither the Louisiana open primary system nor the typical partisan primary system frustrates the federal statute's goal of controlling and containing the power of the states to independently arrange congressional elections by requiring that they be tied to a common termination date. Nor does either primary system present an obstacle to the federal objective of guarding against "throwing voters" from state to state. The open primary does not hinder, any more than the partisan primary, the federal objective of elimination of unnecessary elections and undue influence due to the timing of elections. The text and the legislative history of the federal statute do not reveal a clear congressional purpose to oust or displace state powers to enact state open primary systems or partisan primary systems that use the federal election day as the general election date. The most plausible inference from the federal law establishing the federal election day is that Congress did not contemplate that state power to enact any reasonable primary system incorporating the federal election day would be impaired.
 
 
 17
 Because the Supreme Court is "generally reluctant to infer preemption," e.g., Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 132, 57 L. Ed. 2d 91, 98 S. Ct. 2207 (1978), and cases cited therein, Congress must speak clearly and make its intention to preempt unmistakable.
 
 
 18
 Under the standard applicable here, there is no "actual conflict" unless the state law frustrates the purposes of the federal law. This criterion is not easy to meet. For example, a state law does not frustrate federal purposes merely because it provides for less competition, La.Pub.Serv. Com. v. FCC, 476 U.S. 355, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986), or requires that federally licensed vessels in interstate commerce also meet local pollution standards, Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 4 L. Ed. 2d 852, 80 S. Ct. 813 (1960), or prohibits items transported in interstate commerce that do not meet state maturity standards which are set higher than federal maturity standards. Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 10 L. Ed. 2d 248, 83 S. Ct. 1210 (1963). In all these cases, the state requirements place hurdles in the way of federal regulation, but theses hurdles are not treated as improper unless the party claiming preemption proves that Congress clearly intended to preclude concurrent state and federal regulation. See 2 Rotunda & Nowak, Treatise on Constitutional Law 12.4 at 91 (2d ed. 1992).
 
 
 19
 The Supreme Court's recent preemption cases signal that, out of respect for Federalism, the more democratic branches of the central government should be preferred to make the primary decisions limiting the power of the states to regulate concurrently with the federal government. Because Congress has the ultimate power to decide preemption cases--Congress after all can always overrule the Court on this question--Congress ought to exercise this power unambiguously and shoulder the ultimate responsibility as well. Id.; cf. Michigan v. Long, 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983) (states should not be bound by phantom federal restrictions).
 
 
 20
 2. If not overruled, the panel decision should be limited and clarified. The panel majority evidently was not at first convinced by the plaintiffs' argument that de facto determiniative primary elections may stand because they do not "actually conflict" with the federal election day law, while de jure determinative primary elections do conflict and are therefore preempted. Instead of distinguishing between de facto and de jure determinative primary elections, the panel held sweepingly that "Congress intended that all determinative federal elections be held on federal election day except for the rare exceptions specified in 2 U.S.C. 8." Love v. Foster, 90 F.3d 1026, 1030 (emphasis added). Specifically, 2 U.S.C. 8 provides that "the time for holding elections . . . for a Representative or Delegate to fill a vacancy, whether such vacancy is caused by a failure to elect at "the time prescribed by law, or by the death, resignation, or incapacity of a person elected, may be prescribed by the laws of the several States and Territories respectively." Under the panel majority holding, any system permitting a determinative primary election, whether de facto or de jure, before the federal election day, is preempted. According to the original panel decision, only elections by plurality vote on the federal election day or primaries held on that day, followed by run-off elections afterwards, are permissible, because all pre-federal election day primary systems allow the possibility of either de facto or de jure determinative elections, both of which "actually conflict" with the federal law.
 
 
 21
 The panel majority's supplemental per curiam suggests, but does not clearly acknowledge, abandonment of its original broad holding in favor of a rationale based on the de jure--de facto distinction underlying the plaintiffs' argument. The per curiam states that "all we hold is that Louisiana's election plan, to the extent it precludes any legal election. . . on Federal Election Day, conflicts with. . ." the federal election day law. (emphasis added)
 
 
 22
 The panel majority's resolution of the case is flawed in several respects. The court is left without a single, clear justification for its decision The panel neither clearly states its intention to jettison its original broad holding nor offers any explanation for its approval of a strictly de jure--de facto rationale. Consequently, the doubt that the initial opinion casts on all pre-federal election day primary systems has not been dispelled; and the per curiam is void of any demonstration of a Congressional intent to displace either open or partisan primary systems that incorporate the federal election day. As a further result, the panel majority fails to give clear guidance to states in the framing of election laws. Although it suggests one way to devise an open primary system compatible with federal law, the two rationales the panel majority in turn embraces suggest other contradictory possibilities--on the one hand, that no pre-federal election day primaries that might result in de facto elections are permissible; on the other, that an open election system such as Louisiana's will pass muster if it prevents de jure determinative primary elections by allowing for write-in candidates and by requiring that a primary victor's name be placed on the ballot on the federal election day.
 
 Conclusion
 
 23
 This case presents issues worthy of the time, attention, and efforts of the entire court, viz., whether the panel precipitiously declared state statutes preempted by federal law without following the teachings of the Supreme Court, and whether the panel decision's potential serious impact on other state primary election systems warrants further clarification and limitation. Accordingly, I respectfully Dissent from the court's decision to deny reconsideration of this case.
 
 
 
 [1]
 District Judge of the Eastern District of Louisiana, sitting by designation
 
 
 [1]
 Two cases in which that conflict theory was argued but rejected further demonstrate its irrelevance here. In Florida Avocado Growers v. Paul, 373 U.S. 132, 142-143, 10 L. Ed. 2d 248, 83 S. Ct. 1210 (1963), the case usually cited for the first conflict-preemption rule, the Supreme Court observed that "[a] holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce." In that case, the Supreme Court concluded that no federal-state law conflict existed where federal marketing orders forbidding the picking and shipping of South Florida avocados before a certain date do not render invalid, on the ground of impossibility of dual compliance, a California statute prohibiting the sale of avocados containing less than 8 percent of oil, by weight, excluding the skin and seed, where Florida avocados marketed in California attain or exceed 8 per cent when in prime commercial marketing condition, and Florida growers may avoid rejection of their avocados in California by leaving them on the trees beyond the earliest picking date set by the federal orders. Thus, the Court concluded that the present record demonstrated no inevitable collision between the two schemes of regulation, despite the dissimilarity of the standards. Id. at 142-143. In Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 78 L. Ed. 2d 443, 104 S. Ct. 615 (1984), the Supreme Court held that a state law authorizing award of punitive damages was not pre-empted by the Atomic Energy Act. The Court concluded that the award of punitive damages did not conflict with the federal remedial scheme under which the NRC is authorized to impose civil penalties on licensees for violation of federal standards because paying both federal fines and state-imposed punitive damages for the same incident is not physically impossible and exposure to punitive damages does not frustrate any purpose of the federal remedial scheme
 
 
 [2]
 "Prior to the enactment of the open primary regime in 1978, Louisiana's Congressional election system complied with the Federal Election Day Statutes." Appellants' Brief at 32; "Primary elections, partisan or otherwise, in advance of Federal Election Day ballot are permissible under the Federal Election Day Statutes so long as such 'primaries' are not conclusive ipso jure." Id. at 17
 
 
 [3]
 "The [appellants] do not dispute that where only one candidate 'qualifies' for U.S. Representative or U.S. Senator in the sense of timely filing the appropriate candidacy papers and otherwise meeting the relevant age and residence requirements, that candidate is indeed "unopposed" on the Federal Election Day ballot, and the State is not required to place such candidate's name on the Federal Election Day ballot." Appellants' Reply Brief at 6
 See also United States v. Classic, 313 U.S. 299, 311, 85 L. Ed. 1368, 61 S. Ct. 1031 (1941): "In common with many other states Louisiana has exercised [its] discretion [under 2 of Article I of the Constitution] by setting up machinery for the effective choice of party candidates for representative in Congress by primary elections and by its laws it eliminates or seriously restricts the candidacy at the general election of all those who are defeated in the primary."