Martha L. **MILLSAPS, Frank J. Conti, and Rachel D. Conti, Plaintiffs,**

v.

Brook **THOMPSON, Tennessee Coordinator of Elections, and Riley C. Darnell, Secretary of State of Tennessee, Defendants.**

No. 1:99–CV–261.

United States District Court, E.D. Tennessee, at Chattanooga.

Feb. 23, 2000.

---

Lawrence S. Eastwood, Jr., Baker, Donelson, Bearman & Caldwell, Nashville, TN, Cameron S. Hill, Baker, Donelson, Bearman & Caldwell, Chattanooga, TN, M. Miller Baker, Charles R. Spies, Richard B. Rogers, Carr, Goodson, Warner, Washington, DC, Patrick M. McSweeney, McSweeney, Burtch & Crump, PC, Richmond, VA, for plaintiffs.

Michael W. Catalano, Office of the Attorney General and Reporter, Civil Litigation/State Services Division, Nashville, TN, for defendants.

### *MEMORANDUM*

EDGAR, Chief Judge.

In this matter, plaintiffs Martha L. Millsaps, Frank J. Conti, and Rachel D. Conti challenge the validity of the Tennessee early voting system ("TEVS"), TENN.CODE ANN. §§ 2–6–101 – 2–6–111, 2–6–301 – 2–6–312 (1999). Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201 for declaratory and injunctive relief, contending that TEVS conflicts with the federal statutes prescribing the date for federal elections, 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1, and is therefore preempted under the Supremacy Clause of the United States Constitution, U.S. CONST. art. VI, § 2.

Presently there are two motions before the Court. The plaintiffs move for summary judgment (Court File No. 4) pursuant to FED.R.CIV.P. 56(c). Defendants Brook Thompson and Riley C. Darnell respond with a motion to dismiss for failure to state a claim upon which relief may be granted (Court File No. 10) pursuant to FED.R.CIV.P. 12(b)(6). Since several matters outside the pleadings have been presented to the Court, both motions shall be treated as motions for summary judgment pursuant to FED.R.CIV.P. 56(c). There is no dispute about the material facts of this case. Each party calls upon the Court to rule in his or her favor as a matter of law.

On December 6, 1999, the Court held oral argument on the motions. Having carefully considered the arguments advanced by each party at oral argument as well as the entire record before it, the Court will **DENY** the plaintiffs' motion and **GRANT** the defendants' motion. The case will be **DISMISSED.**

### I

Elections for Tennessee General Assembly Members, Members of the United States House of Representatives, United States Senators, Governor, and Electors for President and Vice President are to be "held at the regular November election." TENN.CODE ANN. § 2–3–203. Since 1870, the Tennessee Constitution has specified the date of the "regular November election" as the "first Tuesday after the first Monday in November. Said elections shall

terminate the same day." TENN. CONST. art. II, § 7.

In 1994, the Tennessee General Assembly enacted a system for early voting, enabling voters to cast their ballots during a specified period prior to the first Tuesday after the first Monday in November. *See* TENN.CODE ANN. §§ 2–6–101 – 2–6–111; *see generally* 1994 Tenn.Pub.Acts ch. 859, § 2 (amending Election Code and enacting TEVS). Under TEVS, Tennessee voters may report to a county election commission or other specially designated polling place between the twentieth and fifth days before the day of the election in order to vote. *See* TENN.CODE ANN. § 2–6–102. The votes of early voters are not immediately counted, but rather are held, along with absentee ballots, until all polling places statewide close on the first Tuesday after the first Monday in November. *See id.* § 2–6–304. In contrast to the absentee voting system, which requires the voter to identify one of several specified reasons for voting absentee, *see id.* §§ 2–6–201 – 2–6–202, all registered voters may vote early under TEVS, with only the restriction that they sign an application for a ballot before voting. *See id.* § 2–6–102(a)(1). Early voting has proven to be a viable and convenient option for a considerable number of Tennesseans. In the November 1996 election, for instance, early voters cast 20.82% of the state's total ballots.

The plaintiffs in the instant case are registered voters in Tennessee's Third (Martha Millsaps) and Eighth (Frank Conti and Rachel Conti) Congressional Districts. They intend to vote in the 2000 election for United States Congress, Senate, and President, on Federal Election Day, November 7, 2000, and wish to participate in poll-watching activities on that day as well. They allege that, by extending the period of voting from one day to just over two weeks, TEVS burdens their opportunity to take part in poll-watching.

## II

Federal law is the "supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. The courts of the United States have interpreted the Supremacy Clause in the Constitution to nullify the application of state law that in any way encroaches on the administration of federal law. *See Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 604, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991); *Northwest Central Pipeline Corp. v. State Corporation Comm'n of Kansas,* 489 U.S. 493, 509, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989); *Louisiana Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. 355, 368–69, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986); *Wellons v. Northwest Airlines, Inc.,* 165 F.3d 493, 497 (6th Cir. 1999) (Krupansky, J., dissenting); *CSX Transportation, Inc. v. City of Plymouth, Michigan,* 86 F.3d 626, 627–28 (6th Cir. 1996).

A federal statute's preemptive effect derives from one of three sources. *See Gustafson v. City of Lake Angelus,* 76 F.3d 778, 782 (6th Cir.1996); *Larkin v. State of Michigan Dep't of Soc. Serv.,* 89 F.3d 285, 289 (6th Cir.1996) (citing *Michigan Canners & Freezers Ass'n v. Agricultural Marketing and Bargaining Bd.,* 467 U.S. 461, 469, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984)). First, Congress may state a clear intent to preempt state law. *See id.* Second, a federal statute may impliedly preempt state law by " 'occupying the field' of regulation." *Gustafson,* 76 F.3d at 782 (quoting *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)). Third, federal law preempts state law where there is an actual conflict between the two laws. *See id.* at 782–83; *Larkin,* 89 F.3d at 289 (citing *Michigan Canners,* 467 U.S. at 469, 104 S.Ct. 2518). "Such conflict occurs where 'compliance with both federal and state regulations is a physical impossibility,' *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or where state law 'stands as an obstacle to the accom-

plishment and execution of the full purposes and objectives of Congress.' *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)." *Gustafson,* 76 F.3d at 783; *see also Wisconsin Public Intervenor,* 501 U.S. at 605, 111 S.Ct. 2476 (quoting *Florida Lime* and *Hines* for the same principle). The plaintiffs contend that TEVS is invalid under the third variety of federal preemption, conflict preemption.

### III

■ The Elections Clause of the Constitution provides that:

The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

U.S. CONST. art. I, § 4, cl. 1. The Supreme Court has explained that in this clause "the states are given, and in fact exercise a wide discretion in the formulation of a system for the choice by the people of representatives in Congress." *United States v. Classic,* 313 U.S. 299, 311, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). Tennessee, like all states, is thus free to determine the time, place, and manner of holding congressional and senatorial elections, unless Congress specifies otherwise. *See id.* at 315, 61 S.Ct. 1031.

In 1872, Congress promulgated the first of several statutes that designate a day for federal elections. 2 U.S.C. § 7 provides that:

The Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter.

Later, after the Seventeenth Amendment brought the direct election of Senators, Congress utilized the same day for senatorial elections. According to 2 U.S.C. § 1,

At the regular election held in any State next preceding the expiration of the term for which any Senator was elected to represent such State in Congress, at which election a Representative to Congress is regularly by law to be chosen, a United States Senator from said state shall be elected by the people thereof for the term commencing on the 3d day of January next thereafter.

The election of presidential electors was similarly set for the first Tuesday after the first Monday in November in every fourth year. *See* 3 U.S.C. § 1. The cumulative effect of these statutes, the Supreme Court has said, is to "mandate[ ] holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster v. Love,* 522 U.S. 67, 70, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997).

### IV

■ Whether TEVS, which permits voting by Tennesseans prior to the first Tuesday after the first Monday in November, conflicts with these federal enactments depends on the statutory meaning of the word "election." One such definition was provided by the Supreme Court in *Foster,* where the Court said, "When the federal statutes speak of 'the election' of a Senator or Representative, they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder...." *Foster,* 522 U.S. at 71, 118 S.Ct. 464.[1]

The plaintiffs have advanced a narrower definition that would confine an election to

---

1. The *Foster* case concerned the Louisiana "open primary" system, through which an officeholder could be selected by the electorate as early as October, with no additional determination to be made on the first Tuesday after the first Monday in November. *See id.* at 70. The Court concluded that because the Louisiana system allowed for the possibility of no action at all on federal election day, then it conflicted with the federal statutes. *See id.* at 72–73. As the *Foster* Court explained, an election for federal officers "may not be consummated prior to federal election day." *Id.* at 72 n. 4.

the date on which ballots are actually cast. The defendants, on the other hand, argue that an election occurs only when all voters have cast their ballots and a winning candidate has been designated.

During 1999, two other federal district courts addressed this question, both construing "election" in ways resembling the definition advanced by the defendants. *See Voting Integrity Project, Inc. v. Bomer,* 61 F.Supp.2d 600, 603–04 (S.D.Tex. 1999), *aff'd,* 199 F.3d 773, 777 (5th Cir. 2000); *Voting Integrity Project, Inc. v. Keisling,* Civ. No. 98–1372–AA, slip op. at 8 (D.Or. Mar. 22, 1999). The Southern District of Texas concluded that an "election" requires two parts: ballot casting and vote tallying. *See Bomer,* 61 F.Supp.2d at 604. The court remarked that the electorate's "final selection" remains unknown until the final ballot count is made. *See id.* Similarly, the District of Oregon, noting that votes for presidential electors are not counted prior to the federal election day, concluded that no presidential elector is appointed in Oregon until the votes are tallied on election day. *See Keisling,* slip op. at 8. The *Keisling* court explained,

> A candidate is not "selected for office" at the time a voter deposits a completed ballot in the ballot box, regardless of whether the ballot is deposited at a polling place on election day, in the mailbox, or at an official site for ballot deposit on or before the designated day.

*Id.*

The Fifth Circuit has affirmed the holding of the Southern District of Texas that the Texas early voting system does not conflict with federal law. *See Voting Integrity Project, Inc. v. Bomer,* 199 F.3d 773, 776 (5th Cir.2000). Like the District of Oregon and the Southern District of Texas, the Fifth Circuit adhered to a definition of "election" similar to that advanced by the defendants in the instant case. The Fifth Circuit noted that under the Texas system, although voters may cast votes seventeen days prior to federal election day, the polls remain open on federal election day and no election results are available until the ballot counting is complete on federal election day. *See id.* at 775–76. Drawing upon the *Foster* definition and the characteristics of the Texas system, the court explained that:

> *Foster* teaches us that "election" means "the combined actions of voters and officials meant to make a final selection of an office holder." 522 U.S. at 71, 118 S.Ct. at 467. Allowing some voters to cast votes before election day does not contravene the federal election statutes because the final selection is not made before the federal election day.

*Id.* at 776.

The Fifth Circuit's conclusion is consistent with *Foster* and is clearly reasonable. An election is the entire process by which both voters and officials make a final selection of an officeholder. Without the "final selection," the winning candidate is not elected. An "election" under the federal election day statutes is more than the mere casting of ballots.

## V

This conclusion does not conflict with congressional intent. While the legislative history surrounding the promulgation of the first federal election day statutes in 1872 is limited to floor debate, the existing congressional discourse evinces an interest in two policy goals. First, the Congress generally sought to buttress the citizens' ability to exercise their right to vote in a fair election. *See Bomer,* 199 F.3d at 777 (citing Cong. Globe, 42d Cong., 2d Sess. 3407–08 (1872)). Second, Congress endeavored to assuage two perceived ills: "the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States, and ... the burden on citizens forced to turn out on two different election days to make final selections of federal officers in presidential election years...." *Foster,* 522 U.S. at 73, 118 S.Ct. 464 (citing Cong. Globe, 42 Cong., 2d Sess. 141 (1871) (remarks of bill spon-

sor Rep. Butler)); *see also Busbee v. Smith,* 549 F.Supp. 494, 524 (D.D.C.1982) (three-judge court) (identifying the same two purposes from Rep. Butler's statement), *aff'd,* 459 U.S. 1166, 103 S.Ct. 809, 74 L.Ed.2d 1010 (1983).

TEVS does not promote any of the conditions which Congress was attempting to remedy. The votes cast during the early voting period in Tennessee have no determinative effect until the polls close on the federal election day designated by Congress. Tennessee election results cannot influence results in other states; and, far from making it difficult for citizens to vote, TEVS makes voting much more convenient and accessible than it would otherwise be.

Finally, states have permitted absentee voting for over a century. *See Bomer,* 199 F.3d at 776 (citing Edward B. Moreton, Jr., *Voting By Mail,* 58 S.Cal.L.Rev. 1261, 1261–62 (1985)). Congress has surely been aware of absentee voting, and has taken no action to curb it. This makes it clear that Congress never intended that the states cannot hold an election for federal officials unless all ballots are cast on the Tuesday after the first Monday in November.

### VI

TEVS presents no obstacle to accomplishing the goals of the federal election day statutes. Tennessee's effort to increase voter participation does not conflict with, and is therefore not preempted by, the federal laws designating federal election day. A judgment will enter.