plaintiffs cannot seriously contend that Congress intended the federal election statutes to preempt additional State measures designed to protect against fraud.  We decline to accept an argument that would negate the ability of the States to guard against fraud in the exercise of the fundamental right of voting.

### VI.  Conclusion

Under conflict preemption principles, federal law preempts State law when the two actually conflict.  *Gustafson*, 76 F.3d at 782.  In this case, compliance with both Tennessee's Early Voting Statutes and the federal election day statutes does not present "a physical impossibility," *Florida Lime & Avocado Growers*, 373 U.S. at 142-43, because the combined actions of voters and officials meant to make a final selection of federal officeholders—within the meaning of *Foster v. Love*—occur on federal election day.  Nor do the TEVS "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67.  Put another way, there is no reason to think that simply because Congress established a federal election day it displaced all State regulation of the times for holding federal elections.

> The State may make regulations on the subject [of holding elections for representatives to Congress]; Congress may make regulations on the same subject, or may alter or add to those already made.  The paramount character of those made by Congress has the effect to supersede those made by the State, *so far as the two are inconsistent, and no farther*.  There is no such conflict between them as to prevent their forming a harmonious system perfectly capable of being administered and carried out as such.

*Ex Parte Siebold*, 100 U.S. at 386 (emphasis added).  Tennessee law interacts with federal law to form a harmonious system for the administration of federal elections, at least so far as their timing is concerned.  Accordingly, we affirm the judgment of the district court.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2001 FED App. 0256P (6th Cir.)
File Name:  01a0256p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MARTHA L. MILLSAPS; FRANK J. CONTI; RACHEL D. CONTI,
  *Plaintiffs-Appellants,*

v.

BROOK THOMPSON, in his official capacity as Tennessee Coordinator of Elections; RILEY C. DARNELL, in his official capacity as Secretary of State of Tennessee,
  *Defendants-Appellees.*

No. 00-5256

Appeal from the United States District Court for the Eastern District of Tennessee at Chattanooga.
No. 99-00261—R. Allan Edgar, Chief District Judge.

Argued:  April 25, 2001

Decided and Filed:  August 3, 2001

Before:  RYAN and BATCHELDER, Circuit Judges; MATIA, District Judge.[*]

---

[*]The Honorable Paul R. Matia, United States District Judge for the Northern District of Ohio, sitting by designation.

————————————

**COUNSEL**

————————————

**ARGUED:** M. Miller Baker, McDERMOTT, WILL & EMERY, Washington, D.C., for Appellants. Michael W. Catalano, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** M. Miller Baker, McDERMOTT, WILL & EMERY, Washington, D.C., Cameron S. Hill, BAKER, DONELSON, BEARMAN & CALDWELL, Chattanooga, Tennessee, Michael S. Nadel, James Michael Lehmann, CARR, GOODSON & WARNER, Washington, D.C., for Appellants. Michael W. Catalano, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

————————————

**OPINION**

————————————

ALICE M. BATCHELDER, Circuit Judge. Martha L. Millsaps, Frank J. Conti, and Rachel D. Conti, all of whom have previously voted in federal elections held in Tennessee and intend to do so again, brought suit under 42 U.S.C. § 1983 alleging that Tennessee's early voting system conflicts with federal statutes that establish the first Tuesday after the first Monday in November in even-numbered years as election day for federal officeholders, dilutes their right to vote, and impedes their ability to participate in poll-watching programs. The complaint named the Tennessee Coordinator of Elections and the Secretary of State of Tennessee in their official capacities as defendants and sought declaratory and injunctive relief, costs, and attorneys' fees.

Plaintiffs promptly moved for summary judgment, and the defendants responded by seeking dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Following a hearing on the matter, the district court issued a memorandum opinion granting the defendants' motion, which it converted to one for summary judgment pursuant to Rule

preempts State law when the latter "stands as an obstacle to the . . . execution of the full purposes and objectives of Congress").

The plaintiffs argue that the Early Voting Statutes conflict with federal law because they interfere with the method Congress chose to ensure the integrity of elections. In the plaintiffs' view, that the TEVS make voting more convenient and accessible and contain their own safeguards against fraud has no relevance to the preemption analysis. Instead, because "Congress settled upon declaring a single uniform day for voting as a method for preventing election fraud," the TEVS must adhere to the congressionally chosen method.

We reject the plaintiffs' argument for two reasons. First, the legislative history suggests that Congress established a uniform federal election day to fulfill multiple objectives. Specifically, Congress sought to prevent early elections in one State from influencing those in States voting later, to remove the burden of voting in multiple elections in a single year, and to minimize the opportunity for voters to cast ballots in elections held in more than one State. *Love*, 90 F.3d at 1029; *Busbee*, 549 F. Supp. at 524. At most Congress has demonstrated concern for fraud only in the narrowest sense, that of voting in federal elections held in more than one State. In any event, Congress did not establish a federal election day solely for purposes of combating fraud, even in this limited sense. Accordingly, the day represents the means of accomplishing the combined objectives underlying enactment of the federal statutes, and the Early Voting Statutes do not stand as an obstacle to substantial achievement of these goals.

Second, under the plaintiffs' argument that Congress established a single day for voting to prevent election fraud, federal law would preempt all State statutes aimed at protecting against fraud in federal elections because limiting voting to that day itself would set the outer limits of the safeguards deemed necessary to achieving that goal. Just as the plaintiffs' position asks too much because it cannot in a principled fashion distinguish absentee voting, so too the

voting statutes and halfheartedly maintain that a court could excuse such a de minimis violation of the federal election day statutes. "[T]he venerable maxim *de minimis non curat lex* ('the law cares not for trifles') is part of the established background of legal principles against which all enactments are adopted, and which all enactments (absent contrary indication) are deemed to accept." *Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992). Finding such an exception here would create at least two problems. First, the plaintiffs ask us to accept that the legislative history of the federal statutes evinces a clear congressional intent to establish a single day for voting, yet somehow countenances de minimis exceptions despite, among other things, the contrary example of the 1872 Act. The same legislative history on which the plaintiffs rely to make their argument would appear to provide a "contrary indication" and rule out any exceptions. Second, recognition of a de minimis exception for absentee voting invites arbitrary line-drawing as courts struggle to identify the point at which voting occurs on days other than federal election day to such an extent that a State's absentee voting statutes conflict with federal law. We simply cannot accept the grave implications of the plaintiffs' arguments.

*E. Frustration of Congressional Purposes and Objectives*

"Identity of ends does not end our analysis of preemption." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 380 n.14 (2000) (citing *Wisconsin Dep't of Indus., Labor & Human Relations v. Gould, Inc.*, 475 U.S. 282, 286 (1986)). When the law of a State shares the same goal as federal law, federal law will preempt the State law if it "interferes with the methods by which the federal statute was designed to reach this goal." *International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). *See also Geier v. American Honda Motor Co.*, 529 U.S. 861, 881-82 (2000). A common end will not neutralize conflicting means. *Crosby*, 530 U.S. at 380. Therefore, to survive preemption analysis State law must not "actually conflict" with the means Congress chose to effect its purpose. *Hines*, 312 U.S. at 67 (stating that federal law

12(b), and denying that of the plaintiffs. *See generally Millsaps v. Thompson*, 96 F. Supp. 2d 720 (E.D. Tenn. 2000). This timely appeal followed, and raises the question whether Tennessee's early voting system conflicts with federal statutes establishing the first Tuesday after the first Monday in November as federal election day. We will affirm the judgment of the district court.

## I. Tennessee's Early Voting Statutes

Tennessee holds elections for Members of Congress, United States Senators, Electors for President and Vice President, and various state officers "at the regular November election." TENN. CODE ANN. § 2-3-203 (Supp. 2000). Since 1870 the Tennessee Constitution has specified the date for this election as "the first Tuesday after the first Monday in November. Said elections shall terminate the same day." TENN. CONST. art. II, § 7. Since 1949 Tennessee law has also allowed those absent on election day from the county in which they are registered to vote to cast ballots by mail prior to election day. TENN. CODE ANN. § 2-6-201. *See also Hilliard v. Park*, 370 S.W.2d 829 (Tenn. 1963).

In 1994 the Tennessee General Assembly enacted a system for early voting to enable registered voters to cast ballots during a specified period prior to the day scheduled for the regular November election. Tennessee's Early Voting Statutes ("Early Voting Statutes" or "TEVS") create a procedure for those wishing to vote prior to election day:

> A voter who desires to vote early shall go to the county election commission office within the posted hours not more than twenty (20) days nor less than five (5) days *before the day of the election*. A voter desiring to vote in the early voting period shall sign an application for a ballot.

TENN. CODE ANN. § 2-6-102(a)(1) (emphasis added). When an early voter casts a ballot in accordance with the Early Voting Statutes, county election officials do not immediately count the vote; rather, they hold the ballots of early voters

until the close of all polling places on the first Tuesday after the first Monday in November, then record the early votes along with absentee votes. *Id.* § 2-6-304(e). In contrast to absentee voting, which requires a voter to identify one of a few specifically enumerated reasons for voting absentee, *id.* §§ 2-6-201, -202, the TEVS allow any registered voter to vote early if he or she wishes. *Id.* § 2-6-102(a)(1). The Early Voting Statutes clearly set forth the rationale for this system: "The purpose of this part is to establish an early voting period when eligible registered voters may vote *before an election* at the county election commission office or another polling place appropriately designated by the county election commission." *Id.* § 2-6-101(b) (emphasis added).

Early voting has proved to be a popular method for casting ballots. In the 1996 presidential election, 399,317 of the 1,918,156 votes cast in Tennessee, 20.82 percent, were early votes; an additional 35,815 voters, representing 1.86 percent of the total votes cast in Tennessee, voted absentee. In the 2000 presidential election, the number of early votes increased dramatically: 749,170 of the 2,100,241 votes cast, 35.67 percent, were cast early, with an additional 47,954 voters, 2.28 percent, casting absentee ballots.

## II. Standard of Review and Preemption Standards

We review a district court's grant of summary judgment de novo, using the same standard under Rule 56(c) used by the district court. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc).

Under the Supremacy Clause of the United States Constitution, "state laws that 'interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid." *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)). Whether federal law preempts state law turns principally on congressional intent. *Northwest Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509 (1989). In analyzing preemption, "we start with the assumption that the historic

U.S. at 509, we acknowledge that the remarks of Representative Butler and Senator Trumbull lend support to the plaintiffs' interpretation of the statute. Additionally, the Senate's rejection of an amendment to allow voting on multiple days in congressional elections suggests that the Legislative Branch intended the federal election day statutes to establish a single day for voting.[6] *Cf. INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language."). Particularly troubling is the 1872 Act, which most likely implies a congressional understanding of voting in federal elections as limited to a single day. Without question the Supreme Court knows of this legislative history. *See, e.g., Foster*, 522 U.S. at 73-74 (relying on the remarks of Representative Butler to interpret the federal elections statutes). Nonetheless, the Court had no trouble defining an "election" as "the combined actions of voters and officials meant to make a final selection of an officeholder." *Id.* at 71. Whatever one makes of the legislative history presented by the plaintiffs, we are bound by *Foster's* definition of "election" in these statutes. Under that definition we conclude that under the TEVS the "combined actions of voters and officials meant to make a final selection of an officeholder" occur only on federal election day as required by federal law.

Like other courts that have considered the question, we see no principled distinction between the Early Voting Statutes at issue in this case and the mechanics of absentee voting. In practical effect, then, the plaintiffs' argument would apply with equal force to absentee voting and result in a declaration that federal law preempts a widely accepted and long-standing electoral practice. Recognizing this difficulty, the plaintiffs protest that they have not challenged Tennessee's absentee

---

[6] Alternatively, the Senate could have viewed an amendment to allow voting over more than one day as unnecessary since not foreclosed by the statutory language at issue.

### D. *Expressio Unius Est Exclusio Alterius*

Taking a somewhat different tack in making their conflict preemption argument, the plaintiffs invoke the traditional canon of statutory interpretation, *expressio unius est exclusio alterius* ("the expression of one thing is the exclusion of others") and claim that by designating the first Tuesday after the first Monday in November as "the day for the election" Congress established the exclusive day for holding federal elections and precluded voting on any other day. Under the *expressio unius* principle, "[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974) (quoting *Botany Worsted Mills v. United States* 278 U.S. 282, 289 (1929)). Therefore, the plaintiffs maintain, "[b]ecause Congress provided for *one* day for voting, multiple-day voting is not permitted under the plain meaning of the Federal Election Day Statutes." To bolster this conclusion the plaintiffs rely on the legislative history of the federal statutes, particularly the 1872 Act granting Texas permission to choose presidential electors that year on more than a single day.

By defining an "election" as "the combined actions of voters and officials meant to make a final selection of an officeholder," *Foster*, 522 U.S. at 71, the Supreme Court has foreclosed this argument. So long as no combined action occurs on any day other than federal election day, or so long as any such combined action is not intended to make a final selection of a federal officeholder, a State has complied with the federal elections statutes. Put another way, the plaintiffs' argument assumes the answer to the question presented by this case, namely the statutory meaning of an "election" under federal law. An "election" under the federal statutes requires more than just voting, and the Early Voting Statutes do not create a regime of combined action meant to make a final selection on any day other than federal election day.

In light of the importance of congressional intent to preemption analysis, *Northwest Cent. Pipeline Corp.*, 489

police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

This court will give preemptive effect to federal law under three circumstances. *Larkin v. State of Michigan Dep't of Soc. Servs.*, 89 F.3d 285, 289 (6th Cir. 1996). First, a federal statute may expressly preempt state law. *Gustafson v. City of Lake Angelus*, 76 F.3d 778, 782-83 (6th Cir. 1996) (citing *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203 (1983)). Second, federal law may impliedly preempt state law. *Id.* (citing *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984)). Implied preemption occurs:

> if a scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," if "the Act of Congress touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or if the goals "sought to be obtained" and the "obligations imposed" reveal a purpose to preclude state authority.

*Mortier*, 501 U.S. at 605 (quoting *Rice*, 331 U.S. at 230) (alterations omitted). Third, federal law preempts state law when the two actually conflict. *Gustafson*, 76 F.3d at 782. State and federal law actually conflict when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

### III.  The Elections Clause of the United States Constitution

The Elections Clause of the United States Constitution states:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

U.S. CONST. art. I, § 4, cl. 1.  Likewise the counterpart to the Elections Clause for the Executive Branch provides:  "The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States."  *Id.* art. II, § 1, cl. 3.

On numerous occasions the Supreme Court has expounded the meaning of these clauses.  Under the Elections Clause, "the states are given[] and in fact exercise wide discretion in the formulation of a system for the choice by the people of representatives in Congress."  *United States v. Classic*, 313 U.S. 299, 311 (1941).  The power of the States to prescribe the "times, places and manner" for electing federal representatives encompasses nearly every procedural facet of a federal election.

> It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved . . . .  All this is comprised in the subject of "times, places and manner of holding elections[.]"

administrative actions necessary under Tennessee law to finalize the voters' preference for a candidate, the plaintiffs' focus on the single act of receiving a ballot from a voter presents an unnatural and stilted conception of the actions taken by officials under Tennessee's election laws and loses sight of the fact that an official's mere receipt of a ballot without more is not an act meant to make a final selection.

In fact, *Foster's* narrow holding suggests that, so long as a State does not conclude an election prior to federal election day, the State's law will not "actually conflict" with federal law.  *Foster*, 522 U.S. at 72 & n.4.  To support their position, the plaintiffs finely parse *Foster's* language and characterize the Supreme Court as drawing a distinction between the actions that must take place on federal election day to constitute an "election" and the "final act of selection" of an officeholder, which can occur after federal election day if one of the exceptions in 2 U.S.C. § 8 applies.  In light of the Court's express disavowal in *Foster* that it was establishing any particular actions a State must perform on election day to comply with the federal statutes, this reading simply asks too much.  Although the plaintiffs raise the specter of States scheduling voting to occur at times entirely removed from federal election day and simply counting ballots on the first Tuesday after the first Monday in November, ostensibly complying with *Foster* while in fact manipulating federal elections, this case does not present such a scenario.  Tennessee's statute requires substantial official action on the congressionally prescribed day, and considerable voting continues to take place on election day itself.  Further, Tennessee has drafted its election code around federal election day.  *See, e.g.*, TENN. CODE ANN. § 2-5-101 (calculating deadlines for qualifying for placement of a candidate's name on the ballot by reference to federal election day); § 2-6-102(a)(1) (allowing early voters to cast ballots "before the day of the election").

1372-AA, slip. op. at 8, 12. No court has given serious consideration to the issue left open by the Supreme Court in *Foster* regarding which actions must occur on federal election day in order for a State's election statute to comply with federal law.

### C. Analysis of the Early Voting Statutes under Foster

On appeal the plaintiffs contend that "the casting of ballots by the electorate at large (that is, the electorate's collective marking and depositing of ballots with election officials)" satisfies the *Foster* definition. The plaintiffs assert that the TEVS conflict with federal law by allowing voters to participate in the final selection of officeholders prior to federal election day by marking a ballot and tendering it to a local election official. Because this argument overlooks the Supreme Court's silence in *Foster* as to which acts a State must take on federal election day and not earlier, *Foster*, 522 U.S. at 72, we disagree. Although the plaintiffs maintain that the receipt of ballots prior to federal election day by election officials constitutes sufficient combined action of voters and officials to violate federal law, "final selection" of an officeholder requires more than mere receipt of ballots cast by voters. For example, on election day officials must close and secure the polls, TENN. CODE ANN. §§ 2-7-128 to -130, -134, -137 to -138, count the ballots, *id.* §§ 2-7-131, -133, complete and certify official tally sheets, *id.* § 2-7-132, and publicly announce the results. *Id.* § 2-7-136.[5] With so many

---

[5] Moreover, official action to confirm or verify the results of the election extends well beyond federal election day: county election officials must meet to verify and certify the results announced on election day, *id.* §§ 2-8-101, -104 to -105, preserve pollbooks and ballots, *id.* §§ 2-8-107 to -108, and transmit certified results and various additional materials to the secretary of state, *id.* §§ 2-8-106, -109, who then with the governor and attorney general formally announces the official results. *Id.* § 2-8-110. We understand these procedures to parallel those described by the Supreme Court when it recently catalogued the administrative actions occurring in Florida "[a]fter the election has taken place" to conclude that State's election process. *Bush v. Gore*, 531 U.S. 98, 121 S. Ct. 525, 536 (2000) (Rehnquist, C.J., concurring).

---

*Smiley v. Holm*, 285 U.S. 355, 366 (1932). Of course, Congress can override state election regulations pursuant to its power to "make or alter such regulations." *Cook v. Gralike*, 531 U.S. 510, 121 S. Ct. 1029, 1038 (2001). This "make or alter" power sweeps broadly. *Ex Parte Siebold*, 100 U.S. 371, 387 (1879) ("Congress, by its power to make or alter the regulations, has a general supervisory power over the whole subject[.]"). "The phrase 'such regulations' plainly refers to regulations of the same general character that the legislature of the State is authorized to prescribe with respect to congressional elections. In exercising this power, the Congress may supplement these state regulations or may substitute its own." *Smiley*, 285 U.S. at 366-67. In short, the Elections Clause of the Constitution "is a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted).

By creating a congressional check on the power of the States to regulate federal elections, the Framers sought to curb the potential for abuses by the States and to give the nascent national government the power to preserve itself. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 808-09 (1995) (collecting quotes from James Madison, Gouverneur Morris, and Alexander Hamilton expressing concern that by regulating federal elections the States could manipulate their outcome or cripple the functioning of the national government). *See also id.* at 863, 894 (Thomas, J., dissenting) (providing additional evidence from other contemporaneous writings that the "make or alter" power afforded Congress the means to support the national government and prevent dissolution of the Union). Without a congressional override the Framers feared that the existence of the federal government would depend upon the willingness of the States to hold federal elections. *Id.* *See also* THE FEDERALIST NO. 59 (Alexander Hamilton). Additionally, for the Framers federal uniformity assured that States did not conspire to time elections so as to deprive Congress of a quorum. 9 DOCUMENTARY HISTORY OF THE RATIFICATION

OF THE CONSTITUTION 920 (J. Kaminski & G. Saladino eds., 1990) (arguing that if the States chose the times for holding congressional elections "there might have been as many times of choosing as there are States," and "such intervals might elapse between the first and last election, as to prevent there being a sufficient number to form a House") (remarks of George Nicholas at the Virginia ratifying convention). Accordingly, the Elections Clause gives Congress "the capacity to prescribe both the date and the mechanics of congressional elections." *Thornton*, 514 U.S. at 894 (Thomas, J., dissenting). Other Framers justified the Clause on the ground that federal elections should be "held on the same day throughout the United States, to prevent corruption or undue influence." 2 ELLIOT'S DEBATES 535 (J. Elliot ed., 1937) (remarks of Thomas McKean at the Pennsylvania ratifying convention).[1]

---

[1] Additionally, the plaintiffs cite Hamilton's description of the power conferred on Congress by the Elections Clause to establish "uniformity in the time of elections for the Federal House of Representatives" as a "positive advantage . . . that . . . may be found by experience to be of great importance to the public welfare[.]" THE FEDERALIST NO.61, at 375 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The full passage in which this quote occurs reads:

> But there remains to be mentioned a positive advantage which will result from this disposition and which could not as well have been obtained from any other: I allude to the circumstance of uniformity in the time of elections for the Federal House of Representatives. It is more than possible that this uniformity may be found by experience to be of great importance to the public welfare, both as security against the perpetuation of the same spirit in the body, and as a cure for the diseases of faction. If each State may choose its own time of election it is possible there may be at least as many different periods as there are months in the year. The times of election in the several States, as they are now established for local purposes, vary between extremes as wide as March and November. The consequence of this diversity would be that there could never happen a total dissolution or renovation of the body at one time. If an improper spirit of any kind should happen to prevail in it, that spirit would be apt to infuse itself into the new members, as they come forward in succession. The mass would be likely to remain

---

does not conflict with, and is therefore not preempted by, the federal laws designating federal election day." *Id.*

Like the district court, the other federal courts that have considered arguments similar to those advanced by the plaintiffs have deferred to the authority of *Foster*. For instance, the Fifth Circuit held that "[b]ecause the election of federal representatives in Texas is not decided or 'consummated' before federal election day, the Texas scheme is not inconsistent with the federal election statutes as interpreted by the court in *Foster*." *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 776 (5th Cir.), *cert. denied*, 530 U.S. 1230 (2000). Further, based on the plain language of the federal statutes, the court reasoned that the Supreme Court would not alter *Foster's* definition of "election" to require States to begin their federal elections on federal election day. *Id.* Accordingly, "some acts associated with the election may be conducted before the federal election day without violating the federal election statutes." *Id.* One district court has held:

> A candidate is not "selected for office" at the time a voter deposits a completed ballot in the ballot box, regardless of whether the ballot is deposited at a polling place on election day, in the mailbox, or at an official site for ballot deposit on or before the designated day. Providing various options for the time and place of depositing a completed ballot does not change "the day for the election."

*Keisling*, Civ. No. 98-1372-AA, slip op. at 8.

Both the Fifth Circuit and the Ninth Circuit refused to accept arguments that they took to require striking down absentee voting statutes by implication. *Bomer*, 199 F.3d at 776; *Keisling*, ___ F.3d at ___, 2001 WL 770384, at *5-6. Additionally, all courts that have considered the issue have viewed statutes that facilitate the exercise of the fundamental right of voting as compatible with the federal statutes. *Keisling*, ___ F.3d at ___, 2001 WL 770384, at *6; *Bomer*, 199 F.3d at 777; *Voting Integrity Project, Inc. v. Bomer*, 61 F. Supp. 2d 600, 604 (S.D. Tex. 1999); *Keisling*, Civ. No. 98-

### B.  The District Court's Opinion

In analyzing whether the TEVS conflict with the federal statutes establishing the first Tuesday after the first Monday in November as federal election day, the district court focused on the statutory meaning of the word "election." *Millsaps*, 96 F. Supp. 2d at 723.  Drawing on *Foster* as well as the decisions of the other federal courts that have considered whether early voting statutes conflict with federal law, *Voting Integrity Project , Inc. v. Bomer*, 61 F. Supp. 2d 600 (S.D. Tex. 1999), *aff'd*, 199 F.3d 773 (5th Cir.), *cert. denied*, 530 U.S. 1230 (2000), *Voting Integrity Project v. Keisling*, Civ. No. 98-1372-AA (D. Or. Mar. 22, 1999), *aff'd*, ___ F.3d ___, 2001 WL 770384 (9th Cir. July 11, 2001), the district court favored a broad construction of the definition and concluded that an "election is the entire process by which both voters and officials make a final selection of an officeholder" and encompasses more than merely casting ballots. *Millsaps*, 96 F. Supp. 2d at 724.

Because the Early Voting Statutes have no effect in deciding the winner of an election until the polls close on federal election day, the court reasoned that the TEVS have no influence on elections in other states and so do not frustrate the congressional purpose in establishing a uniform federal election day. *Id.* at 724-25.  Moreover, the TEVS facilitate rather than frustrate voting, thereby advancing another of Congress's goals in enacting the statute.  *Id.* Finally, the long history of absentee voting throughout the country persuaded the district court that the Early Voting Statutes do not conflict with federal law.  "Congress has surely been aware of absentee voting, and has taken no action to curb it.  This makes it clear that Congress never intended that the states cannot hold an election for federal officials unless all ballots are cast on the Tuesday after the first Monday in November." *Id.* at 725.  In conclusion, the court summarized that the Early Voting Statutes "present[] no obstacle to accomplishing the goals of the federal election day statutes.  Tennessee's effort to increase voter participation

### IV.  Federal Elections Statutes

In 1872 Congress established a national uniform election day for choosing members of the House of Representatives by enacting 2 U.S.C. § 7, which provides:

> The Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter.

Upon ratification of the Seventeenth Amendment, Congress adopted a similar provision respecting the election of Senators:

> At the regular election held in any State next preceding the expiration of the term for which any Senator was elected to represent such State in Congress, at which election a Representative to Congress is regularly by law to be chosen, a United States Senator from said State shall be elected by the people thereof for the term commencing on the 3d day of January next thereafter.

2 U.S.C. § 1.  Likewise Congress has set the same date for the selection of presidential electors: "The electors of President and Vice President shall be appointed, in each State, on the

---

nearly the same, assimilating constantly to itself its gradual accretions.  There is a contagion in example which few men have sufficient force of mind to resist.  I am inclined to think that treble the duration in office, with the condition of a total dissolution of the body at the same time, might be less formidable to liberty than one third of that duration subject to gradual and successive alterations.

*Id.* at 374-75.  In context, therefore, the passage cited by Plaintiffs evinces a greater concern for establishing a uniform date for the expiration of federal terms in office than the particular day of the week and month on which the States hold federal elections.

Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President." 3 U.S.C. § 1. In combination these provisions "mandate[] holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster*, 522 U.S. at 69-70.[2]

Although these statutes clearly establish a uniform "Federal Election Day" throughout the nation, the omission of a definition of the term "election" has led the Supreme Court to comment on the opacity of the statutory language at issue in this case, particularly regarding the precise acts that the statutes require a State to perform on that day. *Foster*, 522 U.S. at 72. Accordingly, we turn to the statutes' legislative history, on which the plaintiffs greatly rely, for guidance. *See Schroyer v. Frankel*, 197 F.3d 1170, 1174 (6th Cir. 1999) ("When the language of a provision is ambiguous, we look to the legislative history of the statute in question to ascertain its confines.") (citing *Blum v. Stenson*, 465 U.S. 886, 896 (1984)).

By establishing a uniform date for holding federal elections, Congress sought "to remedy more than one evil arising from the election of members of congress occurring at different times in the different states." *Ex Parte Yarbrough*, 110 U.S. 651, 661 (1884). Specifically, a review of the legislative history of these provisions demonstrates that Congress wanted to prevent States that voted early from unduly influencing those voting later, to combat fraud by minimizing the opportunity for voters to cast ballots in more than one election, and to remove the burden of voting in multiple

---

[2]2 U.S.C. § 8 creates two exceptions to this rule: (1) States requiring a majority vote for election of a Representative may hold a runoff between federal election day and the inauguration of the new Congress; and (2) a congressional election may occur on another day if a vacancy occurs in the office. *Love v. Foster*, 90 F.3d 1026, 1029 (5th Cir. 1996), *aff'd*, 522 U.S. 67 (1997). *See also Public Citizen v. Miller* 813 F. Supp. 821, 830 (N.D. Ga.), *aff'd*, 992 F.2d 1548 (11th Cir. 1993); *Busbee v. Smith*, 549 F. Supp. 494, 524-25 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983).

---

When the federal statutes speak of "the election" of a Senator or Representative, they plainly refer to *the combined actions of voters and officials meant to make a final selection of an officeholder . . . .* See N. Webster, An American Dictionary of the English Language 433 (C. Goodrich & N. Porter eds. 1869) (defining "election" as "the act of choosing a person to fill an office"). By establishing a particular day as "the day" on which these actions must take place, the statutes simply regulate the time of the election, a matter on which the Constitution explicitly gives Congress the final say.

*Id.* at 71-72 (emphasis added). The Court declined to identify these combined acts of voters and officials or to specify which of them must occur on federal election day for a statute to pass muster. *Id.* at 72 ("[O]ur decision does not turn on any nicety in isolating precisely what acts a State must cause to be done on federal election day (and not before it) in order to satisfy the statute."). Accordingly, the Court crafted a narrow holding: "a contested selection of candidates for a congressional office that is concluded as a matter of law before the federal election day, with no act in law or in fact to take place on the date chosen by Congress, clearly violates" the federal statutes. *Id.* To underscore the ground left uncovered by its holding, the Court further noted that "[w]e hold today only that if an election does take place, it may not be consummated prior to federal election day." *Id.* at 72 n.4.[4]

---

[4]Few other cases have attempted a definition of the constitutional or statutory meaning of the term "election." In *Newberry v. United States*, 256 U.S. 232, 250 (1921), the Court recognized that enactment of the Seventeenth Amendment did not alter the original constitutional understanding of an "election" as the "final choice of an officer by the duly qualified electors." Additionally, the Court has recognized that primary elections fall within the scope of congressional power to regulate the "times, places and manner" of holding federal elections as a step in the process of making a final selection of a federal officeholder. *See, e.g.*, *Classic*, 313 U.S. at 320. *Foster*, however, represents the most serious effort to date to infuse meaning into the term "election" and leaves us with "the combined actions of voters and officials meant to make a final selection of an officeholder" as a definition. *Foster*, 522 U.S. at 71.

### A. Foster v. Love and the Statutory Meaning of the Term "Election"

The plaintiffs assert that an "election" within the meaning of the federal elections statutes means "the process of voting by the electorate at large to select an officeholder." Under this view the TEVS conflict with federal law by allowing voting to take place at times other than federal election day. In contrast to this conception of voting as a process, the defendants posit a fundamental distinction between the physical act of casting a ballot and the election of a federal official, which requires ministerial actions of state and local election officials to transform the voters' preference for a candidate into a final act of selection. Accordingly, the defendants submit that, because the TEVS forestall tallying results until the first Tuesday after the first Monday in November, they do not conflict with the establishment of a federal election day.

While acknowledging the difficulty of defining with precision the term "election" as used in the federal elections statutes, the Supreme Court recently provided guidance on the question in *Foster v. Love*, 522 U.S. 67, 72 (1997). There the court reviewed a challenge to Louisiana's open primary system for conducting congressional elections, in which all candidates regardless of party appeared on the same ballot in October of federal election years. Any candidate who received a majority won election without further action on federal election day, but if no candidate received a majority the top two candidates competed in a run-off election held on the first Tuesday after the first Monday in November. Because the Louisiana statute countenanced final selection of members of Congress with no action at all on federal election day, as in fact happened in over eighty percent of elections held under this open primary system, the Court ruled that it conflicted with federal law. *Id.* at 72-73.

In reaching this conclusion, the Court surveyed the federal elections statutes and their legislative history and supplied the following definition of an "election":

elections in a single year. *Love*, 90 F.3d at 1029; *Busbee v. Smith*, 549 F. Supp. 494, 524 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983). These objectives reflect the importance voting played in the political debates of the Reconstruction era. *Voting Integrity Project, Inc. v. Keisling*, ___ F.3d ___, ___, 2001 WL 770384, at *3-4 (9th Cir. July 11, 2001) (placing congressional debates over enactment of 2 U.S.C. § 7 and allowing voting over multiple days in their historical context).

In advancing these rationales, proponents expressed their understanding of what establishing a national, uniform federal election day meant. Representative Butler of Massachusetts, who authored the 1872 law, articulated his aim in sponsoring the legislation:

> The object of this amendment is to provide a uniform time of electing Representatives in Congress . . . . But on account of the facility for colonization and repeating among the large central States, New York holding its election in November, and Ohio, Pennsylvania, and Indiana holding their elections in October, the privilege is allowed the border States, if any man is so disposed, of throwing voters across from one into the other. *I think it will be fair for everybody that on the day when one votes all should vote, and that the whole question should be decided then.*

CONG. GLOBE, 42d Cong., 2d Sess. 112 (1871) (emphasis added). Representative Butler further elaborated:

> Unless we do fix some time at which, as a rule, Representatives shall be elected, it will be in the power of each State to fix upon a different day, and we may have a canvass going on all over the Union at different times. It gives some states undue advantage. It gives some parties undue advantage.

CONG. GLOBE, 42d Cong., 2d Sess. 141 (1871).

In congressional debate over establishing a single national election day, the Senate defeated an amendment that would

have permitted voting for Representatives over multiple days in States that conducted elections for their own officers on more than one day. CONG. GLOBE, 42d Cong., 2d Sess. 676-77 (1871).    Arguing against the amendment, Senator Trumbull of New Jersey explained:

*I think the same day should be fixed throughout the country for the election of members of Congress . . . .* [I]n as much as in some of the States they vote for several days and have but one place for voting in a county, it was suggested that we ought to extend the time of voting for members of Congress as long as it is extended for voting for other officers.  I do not know now, however, that there will be any particular necessity for this amendment . . . . *There is no provision confining the election of members of Congress to a single day until 1876*, and there will be time enough for the states to conform their legislation to the law which will take effect in 1876.  I am not sure now that this amendment is necessary at all.  I rather think that it is not.

CONG. GLOBE, 42d Cong., 2d Sess. 676 (1871) (emphasis added).

In 1872 Congress amended 3 U.S.C. § 1 to allow States to conduct balloting for presidential electors over more than one day in that year's presidential election.  Act of May 23, 1872, ch. 198, 17 Stat. 157.[3]  Congress enacted this provision as a one-time exception to the statutory and constitutional requirement for a uniform day for selection of electors to address the circumstances of Reconstruction-era Texas. CONG. GLOBE, 42d Cong., 2d Sess. 3407-08 (1872).

---

[3]Though not codified in the United States Code, this Act remains part of the Statutes at Large.  When the two conflict, the latter prevails. *United States v. Weldon*, 377 U.S. 95, 98 n.4 (1964) ("[T]he Code cannot prevail over the Statutes at Large when the two are inconsistent.") (quoting *Stephan v. United States*, 319 U.S. 423, 426 (1943)); *Warner v. Goltra*, 293 U.S. 155, 161 (1934) (citing an earlier version of 1 U.S.C. § 204(a)).

Representative Giddings of Texas summarized the situation in his home State:

Mr. Speaker, the passage of this bill, so far as the State of Texas is concerned, is an absolute necessity.  By the law of the State, as now in force, but one place of voting is allowed in each county.  The counties are large.  Some voters have to travel in some of the frontier counties from thirty to seventy-five miles to get to the voting place.  The Legislature of our State cannot convene until after the next election.  There is no legislative body at present in existence there.  An election held in one day in the State of Texas under the present State law would be simply a farce.  It is a matter of impossibility to poll at one place the entire vote of a county, even if the people could be gathered at the place in one day . . . .  The passage of this bill is an absolute necessity in order to secure a full and fair election in Texas.  No legislative change can be made in the State law between now and [federal election day] from the fact no Legislature can convene.  The time allowed the Legislature has expired. There is no legislative body in Texas, and none can convene until November next, and by the State law that election shall occur at the same time as the election for presidential electors.

CONG. GLOBE, 42d Cong., 2d Sess. 3408 (1872).

### V.  Conflict Preemption Analysis

Although the plaintiffs challenge the Early Voting Statutes on the basis of conflict preemption, Tennessee defends the TEVS against preemption on all possible grounds.  Because the plaintiffs only make a conflict preemption challenge, we limit our discussion to the merits of the plaintiffs' claim on this ground.    Whether the Early Voting Statutes "actually conflict" with federal law turns on the answer to the question: "What is an election?"—particularly as it relates to the use of the term in the federal elections statutes.